**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
NEWPORT NEWS DIVISION**

**DOMINION TERMINAL ASSOCIATES, LLP,**

    **Plaintiff,**

v.                                                            Civil Action No. 4:20-cv-00192

**COLLINS ENGINEERS, INC.**

    **Defendant.**

### FIRST AMENDED COMPLAINT

NOW COMES Dominion Terminal Associates, LLP. ("DTA"), by counsel and for its First Amended Complaint against Collins Engineers, Inc. ("Collins"), states as follows:

#### Jurisdiction and Venue

1.    DTA is a Virginia limited liability partnership created and existing under the laws of the Commonwealth of Virginia. DTA maintains its principal office at 600 Harbor Road, Newport News, Virginia. Neither of its partners are citizens of Illinois.

2.    Collins is an Illinois corporation authorized to transact business in the Commonwealth of Virginia with an office located at 745 Bluecrab Road, Suite B, Newport News, Virginia.

3.    This Court has jurisdiction over the parties and venue is appropriate because the events giving rise to the Complaint took place in the City of Newport News and under 28 U.S. Code § 1332.

#### DTA Contracts with Collins to Inspect, Analyze, Design and Manage Repairs to the Pier.

4.    DTA is a coal terminal that loads and ships in excess of $1 billion per year of product from its facility to customers throughout the world.

5. DTA's operations depend on the continual use of its 1,041-foot long pier originally construction in 1982. The pier is made of reinforced concrete deck, beams and pile caps on a combination of concrete and steel piles.

6. Collins is a professional engineering services firm with over twenty offices nationwide.

7. Collins advertises on its website that it specializes in engineering for marine structures and "provides the complete package of waterfront, coastal, and underwater engineering services, including above and below water inspection and assessment, analysis, evaluation, and design of necessary repairs or new facilities; and construction administration and inspection to ensure proper facility rehabilitation." It claims to be a pioneer in engineering for marine structures that is "continually on the leading edge of standards and methodology."

8. After DTA had engaged a marine contractor to inspect deterioration of the pier, in 2010 DTA contracted with Collins, as an experienced marine structures engineer, to inspect the deterioration, prioritize and categorize the defects requiring repair, prepare design plans and specifications for the repairs, develop a complete package for contractors to submit bids, provide construction administration services, and provide internal project management and quality assurance throughout the course of the project.

9. On or about May 10, 2011, DTA and Collins executed a written agreement, signed by Collins, titled an "Agreement to Provide Goods/Services" ("2011 Agreement"). The 2011 Agreement identified DTA as the Buyer and Collins as the Seller. The 2011 Agreement provided that Collins would "supply or provide certain goods and/or services to Buyer from time to time on a purchase order basis at Buyer's facility located in Newport News, Virginia." A copy of the 2011 Agreement is attached as **Exhibit 1**.

10. The 2011 Agreement further provided that it would apply and include "each and all purchase orders issued by the Buyer from time to time and accepted by the Seller for the Purchase of the Work." The 2011 Agreement was to continue "thereafter until terminated by either party giving the other party ten days prior written notice of such termination." The signed 2011 Agreement was never terminated and continued to govern the parties' relationship throughout all relevant subsequent work.

11. In 2011, DTA engaged Collins to provide additional engineering and construction administrative services for the repair of the pier. The parties' contract consisted of the 2011 Agreement, a proposal letter by Collins outlining the work to be done, the DTA Purchase Order in the amount of the proposal, and Collins' completed work, signed by its employee.

12. In June 2011, Collins prioritized what it considered to be the necessary repairs and recommended a program of repairs over a span of five years to the beams and girders that would cost approximately $857,000 according to its estimate.

13. Collins prepared plans and specifications dated May 2012 for the repair to the pier. Collins' design for the repair for the pier consisted primarily of removing visible areas of damaged concrete, cleaning or replacing the reinforcing steel and patching the area using shotcrete (sprayed concrete), while also injecting epoxy into cracks.

14. While DTA trusted Collins' professional judgement in designing repairs to resolve the problem, Collins' repair design did not identify and address the root cause for the deterioration of the pier which is the corrosion of the reinforcing steel resulting from the exposure to the marine environment.

15. Corrosion or rusting of steel causes steel to expand up to ten times its original size and causing concrete surrounding it to crack, subsequently delaminate and eventually spall.

16. Collins initially estimated that approximately 3,561 square feet of repairs was needed for the entire pier.

17. In 2013 and 2014, based on the professional services provided by Collins, DTA engaged a marine contractor to perform repairs in accordance with the plans and specifications prepared by Collins, and Collins inspected and conducted construction management for these repair services pursuant to the Parties' 2011 Agreement and subsequent documentation.

18. The contractor performed repairs totaling approximately 2,810 square feet, or 79% of the total quantity Collins anticipated, yet the contractor was only able to repair approximately 26% of the pier, yet the corrosion process was active in the entire pier.

19. In 2015 DTA continued the parties' professional relationship and Collins again performed another inspection to assess the pier's condition, identify and quantify all defects and deficiencies which could impact the serviceability of the pier such as concrete spalls with exposed reinforcing steel, cracks, cracks with rust staining and overall element deterioration of the pier and provide recommendations for repair and future inspections including drawings and plans signed and sealed by a professional engineer.

20. On or about September 4, 2015, subject to the parties' 2011 Agreement, Collins provided to DTA an Engineering Services Fee Proposal for Structural Inspections of Pier XI, Revision A dated September 4, 2015, and signed by Timothy D. Weeks, P.E., as Regional Manager for Collins ("Proposal"). A true and accurate copy of the Proposal is attached as **Exhibit 2**.

21. Subject to the parties' 2011 Agreement, DTA accepted the Proposal and issued to Collins Purchase Order Number 73281 dated October 27, 2015 (the P.O.). A true and accurate

copy of the P.O. is attached as **Exhibit 3**. The P.O. and Proposal are in all materials respects the same, and in any event, are governed by the parties' signed 2011 Agreement.

22. The 2011 Agreement, Proposal, P.O., and completed, signed work by Collins comprise a contract between DTA and Collins for the provision of engineering services related to the Pier.

23. Subject to the parties' signed 2011 Agreement, this process of proposal followed by acceptance by purchase order was the course of dealings between the parties, as evidenced by their prior transactions, and it was understood that the documents constituted their written contract for the work to be performed. That process to create a written contract by exchange of a proposal and an acceptance by purchase order is a common industry practice, and it is understood in the industry that those two documents together constitute a unified written contract, as was contemplated and governed by the parties' signed 2011 Agreement.

24. In the alternative, to the extent that a factfinder finds any material deviation between the Proposal and the P.O, and concludes that the P.O was merely an offer rather than an acceptance, the P.O. was accepted by performance by Collins, including but not limited to, the performance by production of a signed report incorporating the terms of the P.O., identified below as the Collins Report.

25. On April 18, 2016, Collins provided to DTA its Structural Inspection of Pier XI signed by Gregory S. Desing, P.E., as Project Manager for Collins ("Collins Report"). The Collins Report signed by Mr. Desing states that the work was authorized under Purchase Order Number 73281.

26. Collins submitted invoices for payment to DTA for the work it performed under the Agreement, referencing PO 73281.

27. DTA paid Collins in full for the services rendered totaling $30,345.00.

28. Collins continued its professional services to DTA regarding the inspection, analysis, and design of the pier in April 2017. On or about April 11, 2017, Collins issued another purchase order, subject to the parties' 2011 Agreement, for additional inspections of the Pier. This was explicitly a continuation of the 2015 inspections conducted previously by Collins. Collins conducted those inspections and issued a signed letter on April 18, 2017 ("Second Collins Report"). A copy of the Second P.O. is attached as **Exhibit 4** and the Second Collins Report is attached as **Exhibit 5**.

### The Inspection, Analysis, Recommendations and Design Provided by Collins Was Ineffective and Defective

29. At the time Collins performed its inspection and prepared the Collins Report and the Second Collins Report it was evident that the repairs it designed and DTA implemented were not adequate. Rust was already bleeding through patched areas, and more cracks and failures were developing around the newly patched areas, while deterioration was accelerating throughout the pier.

30. The Collins Report identified more than 3,884 square feet in needed repairs, beyond the 2,810 square feet DTA had already repaired in 2013 and 2014, almost doubling the area of repairs it identified in 2011.

31. The Collins Report recommended that DTA undertake over 36 months the same repair procedures it designed in 2012, with the updated quantities for new concrete spalling and cracks. The Collins Report, like its previous work, failed to identify and address the root cause of the corrosion occurring at the pier, and failed to identify the consequences to DTA of not immediately addressing and halting the corrosion process occurring throughout the Pier. Collins'

6

design only addressed the symptoms of corrosion, i.e., cracking, spalling and delamination, but did not address how to mitigate the ongoing corrosion process.

32. The Second Collins Report noted additional and worsening corrosion, but failed to identify and address the root cause of the corrosion occurring at the pier, and failed to identify the consequences to DTA of not immediately addressing and halting the corrosion process occurring throughout the Pier.

33. Despite DTA's specific inquiries about cathodic protection as a known, established technology providing proven means for corrosion protection in a marine environment, neither the Collins Report nor the Second Collins Report recommended adoption of an active cathodic protection system nor evaluated that its absence would cause continued deterioration of the pier. Collins failure to account for and address the continuing corrosion process through measures such as incorporating cathodic protection in its repair design and recommendations to DTA was a breach of its standard of care.

34. Notably, Collins represented that it had expertise in evaluating reinforced concrete marine structures for the need and design of cathodic protection solutions.

35. In reliance upon the Collins Report and Second Collins Report and Collins' repair design, DTA engaged a marine contractor to perform further repairs on the pier. DTA paid $677,318 for 2,238 of concrete repairs and crack injection. Although DTA performed over 57% of the repair quantity identified in the Collins Report, this amount was only sufficient to address cracks and spalling for approximately 13% of the pier.

36. The repairs performed following Collins design are failing, and the areas around these repairs are suffering increased deterioration as a direct result of the defective and substandard services provided by Collins.

37. Collins continued to provide professional services regarding the inspection, analysis, recommendations, and design of the Pier, including but not limited to, communications and meetings regarding the repairs in April 2018 and July/August of 2019.

38. As a result of the continued deterioration of the pier and failure of the repairs designed by Collins, DTA engaged other design professionals to inspect the pier, determine the cause of the failure and recommend a course of action. These professionals noted that the repairs designed by Collins were already failing because the reinforcement steel is experiencing corrosion induced deterioration, and that without including corrosion mitigation systems in the repairs, the cycle of repair and deterioration would continue to accelerate jeopardizing the pier's functional capacity.

39. To preserve the integrity and functional capacity of the pier, DTA must now undertake a dramatically larger program of repairs to the pier than would have been necessary had Collins met its obligations and standard of care under the Agreement.

40. DTA has engaged competent engineers to design and contractors to perform a comprehensive repair of the pier that includes the installation of an active cathodic protection system to halt the progression of corrosion of the pier and extend its life indefinitely.

41. The repairs DTA undertook that were designed by Collins are ineffective, accelerate damage to the pier, and are incompatible with an effective design that treats and halts the progress of corrosion of the pier such that they must be removed.

42. DTA has incurred damages as a result of Collins' actions including but not limited to the cost paid to Collins for its services, the cost paid to subsequent engineers for their inspection, analysis and design of effective repairs, the cost paid to contractors for ineffective

repairs designed and recommended by Collins and the increase cost of repairs as a result of continued deterioration of the pier since Collins provided its report.

43. DTA provided notice to Collins of the defective nature of the services it provided regarding the pier. Effective June 1, 2020, DTA and Collins entered into a tolling agreement and subsequently amended that agreement such that all statutes of limitations, statutes of repose, notice or other time-related defense or claim, whether statutory, contractual or otherwise were tolled from June 1, 2020, through November 15, 2020.

44. All conditions precedent to the maintenance of this action have been met, satisfied or waived.

## COUNT I
## BREACH OF CONTRACT and PROFESSIONAL STANDARD OF CARE

45. DTA incorporates by reference each of the foregoing paragraphs as if set forth separately again.

46. DTA contracted with Collins as provided in its Proposal submitted October 27, 2015, and Purchase Order 73281 dated October 27, 2015, for the provision of engineering services to include inspection, assessment, evaluation, recommendations for repair and future inspections along with drawings signed and sealed by a Virginia-registered professional engineer.

47. Collins materially breached its contract and standard of care obligations to DTA when it provided its signed report on April 18, 2016, referencing Purchase Order 73281.

48. Collins materially breached its contract and standard of care obligations to DTA when it provided its signed report on April 18, 2017, referencing Purchase Order 77206.

49. Collins materially breached its contract and standard of care obligations to DTA when it continued to provide services subsequent to the Second Collins Report.

9

50. The services Collins provided pursuant to the 2011 Agreement, and subsequent purchase orders, failed to meet the standard of care of an experienced professional engineer for inspecting, evaluating, recommending, and designing repairs to reinforced concrete in a marine environment.

51. Collins breached its contractual obligations and standard of care as professional engineers when it failed to properly inspect, assess, evaluate and analyze the condition of the pier and identify the root cause of the cause for its deterioration and then recommended that DTA engage in defective and useless repair procedures over an extend period of time based on its 2012 design.

52. As a direct and proximate result of Collins' action and inaction that constitute breaches of its contractual obligations and standard of care to DTA, DTA has incurred or will continue to incur damages, including but not limited to mounts paid to Collins pursuant to the Agreement and subsequent inspections; the cost of additional surveys and assessments, the cost of ineffective repairs designed and recommended by Collins and the increased quantity and costs of repairs DTA must now perform to maintain the structural integrity of the pier, all totaling in excess of $5,400,000.00, not including attorney's fees, costs, pre and post-judgment interest.

53. Pursuant to paragraph 15 of the 2011 Agreement, Defendant owes an indemnification obligation including, but not limited to, the attorneys' fees incurred in this litigation.

WHEREFORE, Dominion Terminal Associates, LLP, by counsel, asks that this court award judgment in its favor and against Collins Engineers, Inc., in the amount of $5,400,000.00, plus attorneys' fees, costs and pre and post-judgment interest and for such other and further relief as the Court finds appropriate and just.

**DOMINION TERMINAL ASSOCIATES, LLP**

*/s/ James R. Harvey, III*
James R. Harvey, III (Va. Bar No. 40726)
Dustin M. Paul (Va. Bar No. 75827)
VANDEVENTER BLACK LLP
101 W. Main Street, Suite 500
Norfolk, Virginia 23510
Telephone: 757-446-8600
Facsimile: 757-446-8670
Emails: JHarvey@VanBlackLaw.com
DPaul@VanBlackLaw.com

4819-6773-8578